IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIC BARRON, CHELSEY THOMPSON, SIMON MOELLER,** *on behalf of themselves and all others similarly situated* | : | **CIVIL ACTION** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | **NO.   25-5696** |
| | : | |
| **GENERAL MOTORS LLC** | : | |

## MEMORANDUM

**MURPHY, J.**                                                          **May 18, 2026**

This is a car defect case.  Eric Barron, Chelsey Thompson, and Simon Moeller each bought new vehicles manufactured by General Motors.  Within weeks, their brakes failed, and their cars were in the shop for weeks.  Now, the three purchasers sue on behalf of similarly situated individuals, alleging that GM knew, said nothing, and kept selling defective cars at full price.  GM says we should take an exit ramp — arguing that Mr. Barron and Ms. Thompson are bound to arbitrate their claims — or shift into reverse because plaintiffs somehow managed to insufficiently plead all 13 counts of the complaint.  We kicked the tires on GM's motion, but see no reason to deviate.  GM cannot benefit from arbitration agreements between the plaintiffs and the car dealers, and the complaint is entirely adequate.  We give plaintiffs' claims the green light to proceed to discovery.

## I.      Factual Background

In April of 2025, Eric Barron and Chelsey Thompson entered separate car dealerships and each left with a new 2025 Chevrolet Traverse.  DI 25 at ¶¶ 52, 65.  Mr. Barron purchased his Traverse from Reedman Toll Chevrolet in Springfield, Pennsylvania.  *Id.* at ¶ 52.  Ms. Thompson bought hers at West Herr Chevrolet of Rochester in Rochester, New York.  *Id.* at

¶ 65.  The dealerships assured Mr. Barron and Ms. Thompson that their vehicles were accompanied by a new vehicle limited warranty.  *Id.* at ¶¶ 53, 66.  But within weeks of purchasing their respective vehicles, Mr. Barron and Ms. Thompson both experienced a "Master Brake Defect" — where the master brake cylinder assemblies fail abruptly, leading to the partial or total loss of the ability to engage the vehicles' brake systems.  *Id.* at ¶¶ 1, 55, 68.  In both instances, the defect's occurrence was preceded by the illumination of warning lights on the cars' dashboards.  *Id.*  at ¶¶ 56, 69.  When the master brakes failed on their vehicles, Mr. Barron and Ms. Thompson were in transit; they immediately took the vehicles to their respective dealerships, which confirmed the master brake system had failed.  *Id.* at ¶¶ 56-60; 69-74.  Mr. Barron's vehicle was out of service for 29 days, *id.* at ¶ 62, and Ms. Thompson's vehicle was out of service for 31 days.  *Id.* at ¶ 80.

Simon Moeller had a similar experience.  In March of 2025, Mr. Moeller bought a new 2025 GMC Acadia from Oakes Buick GMC in Kansas City, Missouri.  *Id.* at ¶ 83.  He received assurances from Oakes Buick that the Acadia came with a new vehicle limited warranty, but was not informed of the existence of the vehicle's defective master brake system.  *Id.* at ¶¶ 84.  In July of 2025, Mr. Moeller was driving his Acadia on a highway when the brakes malfunctioned, requiring excessive force with reduced braking capabilities, and warning lights in his vehicle came on.  *Id.* at ¶ 86.  Oakes Buick inspected and repaired the defective brakes.  *Id*. at ¶¶ 87-88.  His car was out of commission for 27 days.  *Id.* at ¶ 89.

Mr. Barron, Ms. Thompson, and Mr. Moeller say that their experiences are part of a larger pattern, and not just among the 2025 Chevrolet Traverse: the 2025 GMC Acadia, 2025 Buick Enclave, 2025 Chevrolet Colorado, and 2025 GMC Canyon — what the complaint calls

2

the "class vehicles" — all allegedly contain master brake cylinder assembly defects. *Id.* at ¶ 1. As with the named plaintiffs, when the defect occurs, the vehicle displays "numerous warning lights," including the red "Brake" light, the anti-lock brake system light, and a message which says "service brake system." *Id.* at ¶ 2. When the brake system fails, drivers experience a loss of the ability to brake, and the peddle either becomes "stiff and hard to press," or sinks to the floor. *Id.* The latent defect is present at the time of sale, but does not manifest until weeks or months after. *Id*. at ¶ 18.

The manufacturer and designer of the vehicles, General Motors LLC (GM), allegedly knew that the class vehicles had defective master brake systems before selling the vehicles. *Id.* at ¶¶ 5, 12, 21. For example, the 2024 Chevrolet Traverse had a similar master brake defect for which GM issued a service update.[1] *Id.* at ¶¶ 5, 21. GM knew about the defect in the 2024 Traverse months before its service update as a result of testing, complaints by owners, and "reports from the field." *Id.* at ¶¶ 6, 24, 27. The service update was the result of significant time spent developing a proposed repair of the defect, and directed dealerships to inspect and (if necessary) replace the master bake cylinder. *Id.* at ¶ 24. For the 2025 class vehicles, GM has issued a service update only for the 2025 Buick Enclave, but has not otherwise issued a service update for the other class vehicles, and did not issue any bulletin to its dealers about the defect or otherwise make a safety recall. *Id.* at ¶¶ 4, 28.

Despite its knowledge of the vehicles' defective master brake systems, GM installed

---

[1] According to the complaint, GM became aware of the defect in the class vehicles "through other sources not available to Plaintiffs and Class Members," such as pre-production testing, design failure mode and analysis early consumer complaints, both exclusively to GM's network of dealers and directly to GM, aggregate warranty data from dealers, testing in response to complaints, and repair order and parts data from dealers. DI 1 at ¶¶ 37-42.

"substantially similar" master brake cylinder assemblies in the class vehicles and marketed them as "safe, reliable, and suitable for everyday use," concealing their defective condition. *Id.* at ¶ 26. For each of the class vehicles, GM provided a 3-year or 36,000 mile new vehicle limited warranty, provided through its dealerships at the time of purchase, which states that "[t]he warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period[.]" *Id.* at ¶¶ 29-32 (citation modified). GM controls the execution of the warranty repairs by providing training, materials, tools, software, and compensation to its dealerships, such that the dealerships are GM's "agents for purposes of vehicle repairs[.]" *Id.* at ¶ 34-46. Plaintiffs provide over 70 examples of complaints related to the class vehicles that were submitted to the National Highway Traffic Safety Administration or otherwise posted online. *Id.* at ¶¶ 47-51.

## II.    The pending motions

Mr. Barron, Ms. Thompson, and Mr. Moeller sue on behalf of a putative class of individuals who purchased one of the class vehicles in New York, Pennsylvania or Missouri and bring thirteen counts: (1) fraudulent concealment; (2) unjust enrichment; (3) violation of the Pennsylvania Lemon Law; (4) breach of express warranty under Pennsylvania law; (5) breach of implied warranty of merchantability under Pennsylvania law; (6) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL); (7) violation of New York Lemon Law; (8) breach of express warranty under New York Law; and (9) violation of the New York General Business Law; (10) violation of the Missouri Lemon Law; (11) breach of express warranty under Missouri law; (12) breach of implied warranty of merchantability under Missouri law; and (13) violation of Missouri Merchandising Practices Act (MMPA). *Id.* at ¶¶ 91-236.

4

GM pursues two avenues of dismissal.  First, GM moves to compel Mr. Barron and Ms. Thompson into arbitration, arguing that because they entered into arbitration agreements with their respective dealerships, GM is entitled to enforce those arbitration agreements as a non-signatory.  DI 16.  Second, GM moves to dismiss the first amended complaint in its entirety for lack of Article III standing and failure to state a claim.  DI 27.  The plaintiffs defend their claims, but withdraw counts 3, 7, and 10 under the state Lemon Laws.  DI 31.

## III.    Standard of Review

"[W]hen it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered without discovery's delay'" under the familiar 12(b)(6) standard.  *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).  Neither Mr. Barron nor Mr. Thompson dispute the existence of their arbitration agreements, DI 19 at 1, so we apply the 12(b)(6) standard to both GM's motion to compel and motion to dismiss for failure to state a claim.  *See Sorathia v. Fidato Partners, LLC*, 483 F. Supp. 3d 266, 272 (E.D. Pa. 2020) (Goldberg, J.) (the fact that complaint did not mention arbitration agreement did "not foreclose operation of a Rule 12(b)(6) standard" where defendants attached the arbitration agreement to their motion to compel and plaintiff did not dispute that she received and signed the agreement).  As such, "we accept as true the factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor."  *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 2 F.4th 242, 248 (3d Cir. 2022) (citation modified).

IV.    **Analysis**

Neither of GM's bids at dismissal is convincing.  First, GM cannot compel arbitration because it did not sign the agreements. We start with the existence of an agreement to arbitrate and conclude that with respect to GM — not the dealerships — there is no agreement to arbitrate. We then conclude that the present dispute with GM is not within the scope of either arbitration agreement.  Second, we deny GM's motion to dismiss for failure to state a claim, determining that the plaintiffs have Article III standing and have plausibly alleged their claims.  We dismiss counts 3, 7, and 10 as withdrawn.

A.  **GM's motion to compel is denied**

GM's motion to compel arbitration gets ahead of itself, diving right into the merits of the motion by arguing (1) that Mr. Barron and Ms. Thompson's arbitration agreements require individual (and not class) arbitration, (2) the question of arbitrability is the job of the arbitrator (and not the court), and (3) that even if considered by the court, that Mr. Barron and Ms. Thompson's claims against GM are within the scope of their arbitration agreements.  DI 16 at 4-11.  That is putting the cart before the horse.  The gating question presented by the motion to compel is whether GM has any right to compel arbitration under the agreements.  The answer is no.

Under the Federal Arbitration Act, agreements to arbitrate are "irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2 (citation modified); *see Field Intelligence Inc. v. Xylem Dewatering Solutions Inc.*, 49 F.4th 351, 355 (3d Cir. 2022) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (noting the "fundamental principal that arbitration is a matter of contract.").

So, "courts 'must rigorously enforce arbitration agreements according to their terms[.]'" *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018) (citation modified).  This includes terms delegating questions of arbitrability to the arbitrator, which require "clear and unmistakable evidence" that the parties intended to do so.  *Coinbase, Inc. v. Suski*, 602 U.S. 143, 149 (2024) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) (citation modified)).

Boiled down, assessing a motion to compel is a two-step process.  At step one, courts apply state law to determine "whether there is an agreement to arbitrate." *Jaludi v. Citigroup*, 933 F.3d 246, 254-55 (3d Cir. 2019) (citation modified).[2]  At step two, the court determines if the dispute falls under the scope of the agreement, also under state contract law.  *Id.*  Since Mr. Barron's arbitration agreement is governed by Pennsylvania law, DI 16-3, and Ms. Thompson's arbitration clause is governed by New York law, DI 16-2, we apply both states' laws here.  *See MacDonald*, 883 F.3d at 228 (collecting cases regarding application of state law to arbitration agreements).[3]

### 1.   *There is no agreement to arbitrate between the plaintiffs and GM*

Both Pennsylvania and New York law require that both parties to an agreement express an "intent to be bound" by its terms for a contract to exist.  *Kelly v. Carman Corp.*, 229 A.3d 634, 653 (Pa. Super. 2020) (citation modified); *Amcan Holdings, Inc. v. Canadian Imperial Bank*

---

[2] The inquiry at step one includes a determination of whether the parties agreed to arbitrate arbitrability.  *See Jaludi*, 933 F.3d at 254 (quoting *First Options*, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (*including arbitrability*), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.") (citation modified).

[3] We apply Missouri law to Mr. Moeller's claims below where appropriate.

*of Commerce*, 70 A.D. 3d 425, 426 (1st Dep't. 2010).  Mr. Barron's arbitration provision

provides that:

> [A]ny claim or dispute, whether in contract, tort, or otherwise (including the interpretation and scope of this clause, and the arbitrability of the claim or dispute), between *you and us* or our employees, agents, successors or assigns, which arise out of or relate to this Agreement or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Agreement) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.

DI 16-3 at 2-3 (citation modified).  The agreement specifies that Reedman Toll is "not the

Manufacturer's agent. You and we are the sole parties to this Agreement." *Id.* at 2.  Ms.

Thompson's agreement says:

> Any controversy or claim, whether in contract, tort, statute, or otherwise (including interpretation of this arbitration clause) arising out of or relating to this contract, or the breach thereof, or in relation to your credit application, or the acquisition or condition of this vehicle, shall be resolved by neutral, binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration rules[.]

It further explains "'You' and 'Your' refer to the Buyer and Co-Buyer. 'We' and 'Us' refer to

the Seller," West Herr Chevrolet of Rochester.  DI 16-2 at 3.

Neither of the arbitration agreements evinces an intent to be bound to arbitrate with GM.

*Kelly*, 229 A.3d at 653; *Amcan Holdings*, 70 A.D. 3d at 426.  Simply put, neither plaintiff agreed

to arbitrate with GM.  So, GM cannot demand to have the question of arbitrability sent to the

arbitrator because it does not have the right to do so; there is nothing close to the requisite "clear

and unmistakable" intent.[4]  *See Kerr v. General Motors*, 2025 WL 2051621, at *3-8 (D. Del.

---

[4] GM also does not contend — nor could it — that it has rights as an intended third-party beneficiary under either of the agreements.  *Elwyn v. DeLuca*, 48 A.3d 457, 461 (Pa. Super. 2012) (third-party beneficiary may fall under the scope of an agreement where that is the parties' intent); *Matter of Arbitration between Alliance Masonry Corp. and Corning Hospital*, 178 A.D.3d 1346, 1347 (1st Dep't. 2019) (same).

July 22, 2025) (applying Texas contract law to identical argument by GM and concluding that the plaintiff "did not agree to delegate the issue of arbitrability in a dispute with a party not named in the agreement."); *Coinbase*, 602 U.S. at 149 ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter.") (emphasis in original) (citation modified).[5]

Contrary to GM's insistence, our conclusion is not altered by the Third Circuit's decision in *Zirpoli v. Midland Funding, LLC*. 48 F.4th 136 (3d Cir. 2022); DI 16 at 7-8. There, the Third Circuit held that defendant Midland, a non-signatory to the original arbitration agreement between plaintiff Zirpoli and OneMain Financial, could compel arbitration on the question of arbitrability. *Zirpoli*, 48 F.4th at 142-45. The plaintiff argued that Midland could not do so because the assignment under the arbitration provision was invalid, but the Third Circuit disagreed because Midland was undisputedly an assignee under the terms of the arbitration agreement. *Id.* at 142-43. The existence of an agreement between the parties compelled arbitration: "there exists here a valid *agreement*. One that Zirpoli signed, binding him to arbitrate claims with OneMain and its future assignee—Midland." *Id.* (emphasis in original). Not so here. There is no agreement between either of the named plaintiffs and GM, and GM is not an assignee. DI 16-2; 16-3.

---

[5] The District of Delaware's decision in *Kerr v. General Motors* is presently on appeal to the Third Circuit, presenting nearly identical facts and legal issues regarding an agreement to arbitrate with a non-signatory. *Kerr et al v. General Motors LLC*, No. 25-2610 (3d Cir. 2025). Since we largely adopt the reasoning of that decision, we deny GM's motion to compel arbitration without prejudice to re-file its motion if the Third Circuit reverses in *Kerr*.

Our conclusion squares with *Zirpoli*: "[t]he policy favoring arbitration is not intended to force arbitration where the parties to a contract *did not agree to it*." *Zirpoli*, 48 F.4th at 142 (citation modified). We do not prematurely assess the validity of the arbitration agreement as the district court did in *Zirpoli*. *Id*. at 142 (explaining that "[i]f we were to . . . decide whether the assignment was valid in performing the first step of the inquiry, we would also be reaching the merits of the motion."). Rather, we determine that since there is no agreement to arbitrate between the parties here, GM has no right to compel it.[6] But even on the merits, denial of GM's motion to compel is appropriate.

> 2. *GM cannot enforce the arbitration agreements under the doctrine of equitable estoppel*

According to GM, even if we consider the arbitrability of this dispute, it may enforce the arbitration agreements as a non-signatory under the doctrine of equitable estoppel. DI 16 at 11-15. We disagree. Pennsylvania and New York law permit a non-signatory to enforce an arbitration agreement by equitable estoppel where there "is an obvious and close nexus between the non-signatories and the contract or the contracting parties." *Noye v. Johnson & Jonhson Services, Inc.*, 765 F. App'x. 742, 746 (3d Cir. 2019) (quoting *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. 2006) (citation modified)); *see also Ross v. Am. Exp. Co.,* 547 F.3d 137, 143 (2d Cir. 2008) (recognizing that non-signatories have been permitted to compel arbitration under estoppel principles). For example, equitable estoppel may be appropriate in scenarios where "a careful review of the relationship among the parties, the contracts they signed

---

[6] Of course, if Reedman Toll and West Herr Chevrolet were defendants and moved to compel, our answer at step one would be an unequivocal "yes." But where, as here, the defendant is expressly not a party to the agreement to arbitrate, we think the answer at step one must be "no."

10

[] and the issues that had arisen among them discloses that the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Ross*, 547 F.3d at 143 (citation modified); *Noye*, 765 F. App'x at 746 (quoting *Elwyn*, 48 A.3d at 463) (Pennsylvania courts consider whether "the claims at issue are inextricably entwined with the contract . . . or stem from the same incident and implicate the same legal principles." ).

In essence, Pennsylvania and New York courts ask whether the circumstances bring the non-signatory so close to the arbitration agreement that it would be unfair to permit the signatory to evade its terms. *Shondel J. v. Mark D.*, 853 N.E.2d 610, 613 (N.Y. 2006) ("The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right we asserted. The law imposes the doctrine as a matter of fairness."); *Zitelli v. Dermatology Educ. and Research Foundation*, 633 A.2d 134, 139 (Pa. 1993) ("Equitable estoppel, a doctrine sounding in equity, acts to preclude one from doing an act differently than the manner in which another was induced by word or deed to act.").  Those circumstances are lacking here.

GM says that according to the plaintiffs' own allegations, there is a relationship between GM and its dealers close enough to trigger equitable estoppel.  DI 16 at 11-15; DI 21 at 6-7.  We agree that the complaint describes some relationship between GM and its dealers, through which GM interacts with purchasers of its vehicles.  DI 20 at ¶¶ 29-36.  For example, the complaint says that "GM provides the warranty booklets to Plaintiffs and class members via its dealerships," and "controls execution of all warranty repairs by its dealers, as it provides training, materials, special tools, diagnostic software, and replacement parts to its dealers, and

11

demands that the warranty repairs be performed in strict accordance with its repair guidelines[.]" *Id.* at ¶¶ 30, 34. But this relationship alone does not justify equitable estoppel. As the Second Circuit has explained, the availability of equitable estoppel to a non-signatory in limited circumstances does not "mean that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate[.]" *Ross v. Am. Exp. Co.*, 547 F.3d 137, 144 (2d Cir. 2008) (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008)).

The availability of equitable estoppel is more limited than GM argues. Courts applying equitable estoppel in favor of a non-signatory "have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of *corporate* relationship to a signatory party," such as "subsidiaries, affiliates, agents and other related business entities." *Id.* at 144 (citation modified). That was the case in *Zirpoli*, where the non-signatory was undisputedly an assignee under the agreement. 48 F.4th at 142-43. In contrast, neither Mr. Barron's agreement with Reedman Toll nor Ms. Thompson's agreement with West Herr lends support for GM's position. DI 16-2; DI 16-3 at 2. And much — perhaps most — of GM's alleged conduct preceded the arbitration agreements, specifically GM's knowledge of the master brake defect at the time the vehicles were manufactured and before being sold, and its marketing of its vehicles as safe and reliable. DI 20 at ¶¶ 25-27, 39-42 100, 164, 226; *White v. Sunoco Inc.*, 189 F. Supp. 3d 486, 494-96 (E.D. Pa. 2016) (Diamond, J.), *aff'd* 870 F.3d 257 (3d Cir. 2017) (declining to permit non-signatory to compel arbitration under equitable estoppel where the plaintiff's claims were "largely antecedent to" the arbitration agreement); *Griswold v. Coventry First LLC*, 762

12

F.3d 264, 274 (3d Cir. 2014).[7]  Neither agreement triggers the fairness concerns that justify

equitable estoppel, so we decline to apply it here.  GM's motion to compel arbitration is denied.

**B.  GM's motion to dismiss for failure to state a claim is denied**

GM advances several arguments that it says merits dismissal of all claims against it.

First, GM says that none of the plaintiffs has Article III standing.  DI 27 at 4-7.  Then, GM turns

to the merits of the claims themselves, lumping them into three groups: (1) fraud and consumer

protection claims; (2) warranty claims; (3) unjust enrichment claims; and (4) lemon law claims.

*Id.* at 8-25.  We take each of GM's arguments in the order presented and deny GM's motion to

dismiss on everything but the lemon law claims.

*1.  The plaintiffs have Article III standing*

Article III standing requires a plaintiff to show three elements: "[h]e must have (1)

suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision." *Associated Builders &*

*Contractors W. Penn. V. Cmty. Coll. Of Allegheny Cnty.*, 81 F.4th 279, 287 (3d Cir. 2023)

(citation modified).  "An injury in fact is 'an invasion of a legally protected interest which is a

(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Id.*

(quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235,

244 (3d Cir. 2012)).  Monetary harms are among the simplest examples of those that will confer

---

[7] In *White*, Judge Diamond applied Third Circuit law to decide the estoppel issue.  189 F. Supp. 3d at 494-96.  The Third Circuit affirmed that decision by applying South Dakota and Florida law, but nonetheless declined to compel arbitration where that plaintiff's claims did "not impinge on the integrity of the Card Agreement between [the signatories]." *White*, 870 F.3d at 266.  We find both decisions instructive here.

Article III standing.  *See id.* at 287-88; *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 163 (3d Cir. 2017) ("Typically, a plaintiff's allegations of financial harm will easily satisfy each of [Article III's] components, as financial harm is a 'classic' and 'paradigmatic form' of injury in fact.") (citation modified); *In re Lincoln National COI Litigation*, 620 F. Supp. 3d 230, 264 (E.D. Pa. 2022) (Pappert, J.) ("Diminution in the value of property is its own injury.").

First, we disagree with GM that the plaintiffs' request for injunctive relief warrants dismissal at this stage for lack of standing.  According to GM, plaintiffs make a "stop me before I buy again," claim, requesting injunctive relief because there is a risk they might suffer harms should they choose to purchase a GM product again.  DI 27 at 7-8 (quoting *Rieger v. Volkswagen Grp. of Am., Inc.*, 2023 WL 3271116, at *6 (D.N.J. May 4, 2023) (citation modified).  The allegations of the complaint are different, however, because they amass repeated examples (from individuals who we assume are putative class members) which describe the dangers and economic harms of purchasing GM's allegedly defective vehicles.  DI 20 at ¶¶ 47-51.  The Third Circuit has cautioned that "[i]nstead of employing 'categorical rules' that would resolve the propriety of injunctive relief 'in a broad swath of cases,' courts should issue injunctive relief only if the moving party makes a sufficient showing that such relief is warranted under the particular circumstances of that case." *TD Bank N.A. v. Hill*, 928 F.3d 259, 265 (3d Cir. 2019) (citation modified).  We think the inverse is also true.  The development of an evidentiary record is necessary to properly rule on the request for injunctive relief here.  *Siemens USA Holdings Inc. Geisenberger*, 17 F.4th 393, 416-17 (3d Cir. 2021) (remanding request for injunctive relief for further development of the evidentiary record); *Snowdy v. Mercedes-Benz USA, LLC*, 2024 WL 1366446, at *8 (D.N.J. Apr. 1, 2024) (declining to dismiss request for injunctive relief at motion

to dismiss stage and compiling similar cases).

Second, we are unmoved by GM's contentions that the "Plaintiffs do not plausibly allege that they have suffered *any* injury sufficient to establish standing, and . . . fail to establish standing to pursue their injunctive relief." DI 27 at 4 (emphasis in original) (citation modified). As the plaintiffs identify, the complaint contains repeated allegations that the alleged defect caused them to pay more for their vehicles, which were worth less at the time of sale as a result. DI 31 at 7; DI 20 at ¶¶ 3, 54, 67, 85, 102, 109-10, 163, 197. And for each of the named plaintiffs — who are the focus of our standing inquiry — there are individualized accounts describing the purchase of the vehicle, the presence of the defect, and that they overpaid for their vehicles as a result.[8] DI 20 at ¶¶ 52-90; *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015) (putative class members need not establish Article III standing. Instead, the "cases or controversies" requirement is satisfied so long as a class representative has standing[.]"). These alleged injuries plainly confer Article III standing. *Tijerina v. Volkswagen Grp. of Am., Inc.*, 2023 WL 6890996, at *9 (D.N.J. Oct. 19, 2023) (purchaser of defective vehicle had Article III standing); *see also McQueen v. BMW of N. Am., LLC*, 2013 WL 4607353, at *3 (D.N.J. Aug. 29, 2013) (same).

### 2. The complaint plausibly alleges fraud and consumer protection claims

GM argues that counts 1, 6, 9, and 13 — for fraudulent concealment and violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, New York General Business

---

[8] This leaves out the fact that the complaint identifies over 70 examples of complaints related to the class vehicles. *Id.* at ¶¶ 47-51. They describe dozens of instances where GM purportedly did not send replacement parts to the dealers, the vehicle was not repaired, no loaner vehicle was provided, or the safety of the driver was placed at risk. *Id.*

Law, and Missouri Merchandising Practices Act — should be dismissed because they "rest upon the same vague allegations: that GM supposedly knew that the relevant vehicles had the brake defect but concealed that issue from customers." DI 27 at 8-9. This is GM's standing argument in a different form.

Under Federal Rule of Civil Procedure 8, there are three requirements to state a claim for relief: (1) a "short and plain statement of the grounds for the court's jurisdiction"; (2) " a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the relief sought[.]" Fed. R. Civ. P. 8(a). "Fundamentally, Rule 8 requires that a complaint provide fair notice of 'what the claim is [] and the grounds upon which it rests.'" *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (citation modified). Thus, Rule 8 "ensures that claims are not filtered for merit at the pleading stage, but are determined on their merits rather than through missteps in pleading." *Id.* (quoting J. Moore, 2 Moore's Federal Practice § 8.04(1)(a) (3d ed. 2019)). Under Federal Rule of Civil Procedure 9(b), however, claims "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). That rule requires that a plaintiff "plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Chaleplis v. Karloutsos*, 609 F. Supp. 3d 341, 347 (E.D. Pa. 2022) (Robreno, J.) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). Both rules are satisfied here.

The claims under Pennsylvania Unfair Trade Practices Act and the New York General Business Law easily meet Rule 8's notice pleading requirements. The elements of a claim for deception under the UTPCPL are: (1) an act that would deceive a consumer acting reasonably

under the circumstances; (2) justifiable reliance on that deceptive act; and (3) an ascertainable loss. *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 418 (E.D. Pa. 2016) (McHugh, J.). Similarly, to state a claim for deceptive trade practices under the New York General Business Law, a plaintiff must allege: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 530 (S.D.N.Y. 2012) (citation modified).

The complaint alleges that Mr. Barron purchased a new 2025 Chevrolet Traverse on April 29, 2025 at Reedman Toll in Springfield, Pennsylvania and provides its vehicle identification number (VIN), DI 20 ¶ 52; he was assured by Reedman that the car was covered by GM's new car warranty, but that GM did not disclose the defect in its promotional materials, on its website, or elsewhere, *id.* at ¶ 53; he overpaid for his vehicle as a result, *id.* at ¶ 54; and he was not provided with a comparable loaner vehicle during the 29 days his car was out of service, *id.* at ¶¶ 62-63. Ms. Thompson's story is nearly identical. She alleges that she purchased a 2025 Traverse on April 10, 2025 at West Herr Chevrolet in Rochester, New York and provides the car's VIN, *id.* at ¶ 65; GM did not disclose the defect in its promotional materials, its website, or elsewhere, *id.* at ¶ 66; she overpaid for her vehicle as a result, *id.* at ¶ 67; and her car was out of service for 31 days, *id.* at ¶ 80. Mr. Barron and Ms. Thompson also both allege that they would not have purchased their vehicles had they been informed of the defect. *Id.* at ¶¶ 54, 67. And all of this is undergirded by extensive allegations of GM's knowledge of the defect. *Id.* at ¶¶ 27, 37-46, 164, 186, 189, 198. GM would therefore be hard pressed to argue that these allegations do not provide fair notice of what the claims are and the grounds on which they rest under Rule 8.

17

*Garrett*, 938 F.3d at 92.

The claims subject to Rule 9's heightened pleading standard — for fraudulent concealment and violation of the MMPA — are also plausibly alleged.[9] A plaintiff alleging fraudulent concealment must plead: "(1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2013) (applying New York law).[10] A claim under the MMPA requires sufficient allegations that the plaintiff "(1) purchased merchandise; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful by . . . the MMPA." *Newport v. CVS Pharmacy, Inc.*, 757 F. Supp. 3d 931, 941 (E.D. Mo. 2024).

Mr. Barron and Ms. Thompson plausibly allege fraudulent concealment, supported in large part by the same allegations that satisfy their claims that are subject to Rule 8. So does Mr. Moeller (with respect to his fraudulent concealment and MMPA claims). He alleges that on

---

[9] *Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 120 (E.D. Pa. 2019) (applying Rule 9(b) pleading standard to claim for fraudulent concealment); *Goldman v. Tapestry, Inc.*, 501 F. Supp. 3d 662, 666 (E.D. Mo. 2020) (applying Rule 9(b) to MMPA claim). GM also contends that Rule 9(b) applies to claims brought under the Pennsylvania Unfair Trade Practices Act. DI 27 at 9. Because the plaintiffs' claim under the UTPCPL is more appropriately read as alleging an act of deception (rather than fraud) under the UTPCPL, the complaint "need only meet the normal pleading standard set forth under Rule 8(a)[.]" *Landau*, 223 F. Supp. 3d at 417-18. But even if Rule 9(b) applied to that claim, the complaint would meet its burden.

[10] The elements of fraudulent concealment under Pennsylvania and Missouri law are substantially similar to New York law, so we treat them together. *Lemons v. Meguerian*, 2022 WL 6746261, at *3 (Oct. 11, 2022) (Sanchez, J.) (applying Pennsylvania law); *Anderson v. Ford Motor Company*, 2017 WL 6733972, at *3 (W.D. Mo. Dec. 29, 2017).

March 31, 2025, he purchased a new 2025 GMC Acadia, DI 20 at ¶ 83; he was assured that the vehicle was covered by GM's new car warranty, but was not informed about the existence of the defect, and it was not disclosed in promotional materials, on GM's website, or elsewhere, *id.* at ¶ 84; he overpaid for his vehicle, and would not have purchased it had he known of the defect, *id.* at ¶ 84; and his car was out of service for 27 days, *id.* at ¶ 89.  GM allegedly became acutely aware of the defect in a variety of ways, including Service Update N242482170 which related to the same master cylinder defect in the 2024 edition of the class vehicles, issued on December 9, 2024 (DI 20 at ¶ 22); consumer complaints (*id.* at ¶ 47-48); testing at its Milford Proving Ground, a facility at which GM allegedly tests its vehicles, including a brake testing facility opened in 2024 (*id.* at ¶¶ 40-42); and reports from dealerships shortly after it began shipping the vehicles (*id.* at ¶¶ 43-46).

The complaint also says that GM was under a duty to disclose the brake defect because it was "in a superior position to know the true state of facts" about the vehicles, "knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use," knew the defect could lead to expensive repairs, and made partial disclosures about the quality of the vehicles without revealing the defect.  *Id.* at ¶ 102.  The plaintiffs allege they could not reasonably have been expected to learn or discover the presence of the defect until after purchase.  *Id.*  Construed as true, this is enough at this stage. *North Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 705 (E.D. Pa. 2021) (Marston, J.) (duty to speak may exist where "one party is the only source of information to the other party or the problems are not discoverable by other reasonable means[,] . . . when disclosure is necessary to prevent an ambiguous  or partial statement from being misleading" or

19

"where subsequently acquired knowledge makes a previous representation false[.]") (citation modified).

Despite the wealth of allegations provided in the complaint, GM contends that the plaintiffs have not plausibly alleged GM's pre-sale knowledge of the defect or that it had a duty to disclose the defect in compliance with Rule 9.  DI 27 at 10-18.  We disagree.  The complaint alleges the "who, what, when, where, and how" required by Rule 9 — "the first paragraph of any newspaper story."  *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (citation modified)).  The "who" is obviously GM.  The "what" is GM's knowing and intentional concealment of the master brake defect in its class vehicles, misleading Mr. Barron, Ms. Thompson, and Mr. Moeller as to the monetary value, condition, and reliability of the vehicles.  The "when" is between 2024 and 2025, when GM allegedly learned of the defect in its 2024 models, confirmed its existence among the class vehicles when it tested them at its newly developed brake facility at the Milford Proving Ground, and subsequently sold the vehicles despite its knowledge of the defect.  The "where" is GM's manufacturing facilities and the location of the alleged vehicle sales — Missouri, New York, and Pennsylvania.  The "how" is GM's silence about the presence of the defect.

It is difficult to see how the complaint does not satisfy Rule 9's objective of giving "defendants notice of the claims against them, provid[ing] an increased measure of protection for their reputations, and reduc[ing] the number of frivolous suits brought solely to extract settlements."  *In re Rockefeller Center Properties, Inc. Securities Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (citation modified).  Doubtless there is much more to be said about the alleged

20

concealment of the master brake defect, but "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed," *id.*, and the complaint alleges that information related to the defect (such as complaints about the class vehicles), is in the "exclusive custody and control of GM and is not yet available to Plaintiffs prior to discovery." DI 20 at ¶ 46; *see also Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003) ("The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim.").

While plausibly alleged, the fraudulent concealment claims brought under Pennsylvania and Missouri law may confront a significant roadblock, because the economic loss doctrine likely applies. "The economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.'" *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002), *rev'd on other grounds*, *Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021); *see also Nestle Purina Petcare Co. v. Blue Buffalo Co. Ltd.*, 181 F. Supp. 3d 618, 638 (E.D. Mo. 2016) (same). While the Third Circuit (in light of guidance from Pennsylvania's courts) has clarified that the doctrine does not extend to circumstances where there is "a statutory basis to impose liability for economic losses," such as under the UTPCPL, it has not created such an exception for fraudulent concealment claims. *Earl*, 990 F. Supp. 3d at 313 (abrogating *Werwinski* for its application of the economic loss doctrine to UTPCPL claims) (citation modified). And while Missouri's federal courts have seemingly acknowledged an exception to the economic loss doctrine for fraud claims, it does not apply where the fraud claim is predicated on the same substance as a contract claim, and where the plaintiffs "do not adequately assert additional damages outside those recoverable in connection with their breach

21

of contract claim." *Compass Bank v. Eager Road Associates, LLC*, 922 F. Supp. 2d 818, 828-29 (E.D. Mo. 2013).

Mr. Barron and Ms. Thompson's breach of express warranty claims sound in contract. *See Blue Cross Blue Shield Association v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 568 (E.D. Pa. 2019) ("A claim for breach of express warranty thus sounds more in contract than in tort.") (citation modified); *see also Nestle Purina*, 181 F. Supp. 3d at 639 (applying Missouri law and explaining "[t]he Eighth Circuit has held that where a representation concerns the quality or safety of the goods sold, the economic loss doctrine bars the fraud claims because they are 'substantially redundant' with warranty claims.") (quoting *Lumber and Cedar Co. v. PPG Industries, Inc.*, 223 F.3d 873, 885 (8th Cir. 2000)). The damages described by the complaint are, in essence, the loss of the benefit of their bargain — "actual and economic damages in that the Class Vehicles and their braking system assemblies are defective and require repairs or replacement, and are worth less money because of the Master Brake Defect." DI 20 at ¶ 110. We think the fraudulent concealment claims under Pennsylvania and Missouri law are redundant of their corresponding warranty claims.[11] But we think it best to make that decision on a full evidentiary record, so we reserve our decision on the application of the economic loss doctrine to the fraudulent concealment claims for summary judgment. The fraud and consumer protection claims will reach discovery.

---

[11] Unlike Pennsylvania and Missouri, "New York courts have routinely permitted intentional fraud claims to proceed, notwithstanding the economic loss doctrine." *Jacobs v. Halper*, 116 F. Supp. 3d 469, 483 (E.D. Pa. 2015); *Acquard v. Big Heart Pet Brands, Inc.*, 2020 WL 12904361, at *6 (W.D.N.Y. Nov. 30, 2020) (permitting intentional fraud claims to proceed despite economic loss doctrine). In accordance with New York's courts, we will permit count 1 to continue under New York law.

   3.  *The complaint plausibly alleges the warranty claims*

The next swath of claims GM moves to dismiss are the express and implied warranty claims — counts 4, 5, 8, 11, and 12.  GM argues that none of the warranty claims adequately allege any damages or injury, that the allegations do not constitute a breach of GM's express warranty for failure to allege that GM did not repair the plaintiffs' vehicles within a reasonable amount of time, and the alleged defect is a design defect not covered by its express warranty.  DI 27 at 19-21.  None of these arguments is persuasive.  First, we have already explained that the complaint plausibly alleges injuries to each of the three plaintiffs.  *See* Section IV.B, *supra*. Second, the plaintiffs' allegations that their vehicles were not repaired within a reasonable amount of time suffice at this stage.  They allege that their vehicles were unavailable for 27, 29, and 31 days respectively.  DI 20 at ¶¶ 62, 80, 89.  Whether that period of unavailability is a reasonable period of time is appropriate for discovery, summary judgment, and maybe trial, but not the motion to dismiss stage.  Third, and similarly, it would be premature to dismiss the plaintiffs' warranty claims by splitting hairs on whether the alleged defect is a design-related defect outside of the warranty, or a material or workmanship-related defect within its scope.  *See Gujral v. BMW of N. Am., LLC*, 2022 WL 3646627, at *3 (D.N.J. Aug. 23, 2022) (compiling cases and holding that it would be premature to decide whether defendant's warranty covered the alleged defect).  Discovery will bear that out.  We deny GM's motion to dismiss the warranty claims.

   4.  *Plaintiffs plausibly allege unjust enrichment*

Last, GM urges dismissal of count 2 for unjust enrichment, but its arguments are unavailing.  DI 27 at 21-24.  The elements of unjust enrichment under Missouri, New York, and

Pennsylvania law are essentially the same: "(1) the plaintiff conferred a benefit upon the defendant; (2) an appreciation of such a benefit by the defendant; and (3) the defendant accepted and retained such benefit under circumstances where it would be inequitable for the defendant to retain the benefit without payment of value." *Brown & Brown v. Cola*, 745 F. Supp. 2d 588, 625 (E.D. Pa. 2010); *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021); *Lizama v. Venus Lab'ys, Inc.*, 679 F. Supp. 3d 848, 867 (E.D. Mo. 2023). As laid out extensively above, the allegations of the complaint (accepted as true) satisfy these elements. GM argues that the complaint does not explain how it would be inequitable to retain the benefit conferred on it by the plaintiffs (their money) when they repaired the vehicles. DI 27 at 21-22. We disagree because the complaint alleges that each plaintiff overpaid for his or her vehicle and would not have bought them at all had they known of the defect. Id. ¶¶ 54, 67, 85. That is enough. *Tijerina*, 2023 WL 6890996, at *9 n.25 ("At this stage, the Court must accept the allegations in the Amended Complaint as true and Plaintiffs allege they conferred a benefit on VW America and VWAG by overpaying for the Class Vehicles.").

GM says that regardless of the unjust enrichment claim's plausibility, it is unavailable here because an adequate remedy at law exists and there is an express contract governing this dispute — the warranty covering the vehicles. DI 27 at 22-23. Apparently, "Plaintiffs allege, and GM does not dispute, the existence of the written Warranty covering their vehicles[.]" *Id.* at 23. But this argument strains credulity. Just one page earlier in its motion to dismiss, GM argues that "the alleged defect here is a purported design defect that falls outside of GM's warranty[.]" *Id*. at 21. If GM had its way on the warranty claims, then, there would not be an adequate remedy barring the unjust enrichment claim. Which one is it? At any rate, the

24

plaintiffs' unjust enrichment claim may be pled in the alternative, so we do not dismiss that claim. *Zeiders v. Volkswagen Group of America, Inc.*, 2026 WL 63709, at \*16 (D.N.J. Jan. 8, 2026) (compiling cases and explaining that unjust enrichment "may be pled in the alternative even if there appears to be an express agreement between the parties if based on the allegation the agreement arose from unlawful or improper conduct, such as fraudulent concealment or negligent misrepresentation."). Count 2 for unjust enrichment will proceed to discovery.

## V.    Conclusion

This case will proceed to discovery. GM may not enforce Mr. Barron and Ms. Thomspon's respective arbitration agreements as a non-signatory because there is no agreement to arbitrate whatsoever with GM, let alone the question of arbitrability. Counts 3, 7, and 10 are dismissed as withdrawn. But GM's motion to dismiss the remaining counts is denied. Discovery will be necessary to determine what, if any, of the plaintiffs' claims should see a trial.

25